IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**FILED**

JAMES MICHAEL HAYES,

JUL **2 0** 2006

Plaintiff,

U.S. DISTRICT COURT
CLARKSBURG, WV 26301

v.                                                   Civil Action No. 2:05CV39
(Judge Robert E. Maxwell)

JO ANNE B. BARNHART,
Commissioner of Social Security,

Defendant.


## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of

the Social Security Administration ("Defendant" and sometimes "Commissioner") denying the

Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social

Security Act. The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of

fact and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b).

## I. PROCEDURAL HISTORY

James Michael Hayes ("Plaintiff") protectively filed his application for Supplemental

Security Income benefits on September 20, 2000, for reinstatement of his SSI benefits (R. 325-28,

344).[1] The West Virginia state agency denied Plaintiff's claim initially and on reconsideration (R.

---

[1] Plaintiff filed an application for Supplemental Security Income on August 26, 1997,
alleging disability due to a back injury and an impairment affecting his legs (R. 32, 271). On
September 25, 1998, Administrative Law Judge Harry C. Taylor, II, found Plaintiff met Listing
1.11 and was, therefore, disabled (R. 267-69, 273). The ALJ did not address mental
impairments in his decision (R. 271-73). Subsequent to the award of benefits, Plaintiff was
incarcerated and his benefits were suspended and then terminated. Upon his release from
incarceration, Plaintiff filed the instant application (R. 32-33).

274-77, 282-82, 289-91). At Plaintiff's request, an administrative hearing was conducted by Barry Anderson, Administrative Law Judge ("ALJ") on October 18, 2001. On November 12, 2001, ALJ Anderson issued a decision finding Plaintiff was not disabled (R. 50-62, 1079-1122). Subsequent to the decision by the ALJ, the Appeals Council granted Plaintiff's request for review, vacated the November 12, 2001, decision and remanded the matter for further proceedings (R. 27, 278-81). Specifically, the Appeals Council directed the ALJ to obtain additional evidence concerning Plaintiff's mental impairments and to evaluate Plaintiff's mental impairments (R. 280). On June 24, 2003, ALJ Randall Moon conducted a hearing, at which Plaintiff, who was represented by Randy Minor; L. Leon Reid, Ph.D., a medical expert; Larry Ostrowski, a Vocational Expert ("VE"); and James Hodgson, a witness for Plaintiff, testified (R. 1123-260). On September 26, 2003, the ALJ issued a decision finding that Plaintiff was not disabled because he could perform work existing in significant numbers in the national economy (R. 32-44).[2] On March 15, 2005, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 8-13).

## II. FACTS

Plaintiff was thirty-five years old when the ALJ issued his September 2003 decision (R. 33, 44). Plaintiff has an eighth-grade education and past employment as a general laborer, as a chicken processor, as a material handler, in lawn care, as a janitor, as a food factory worker, and as an auto mechanic (R. 33, 1142-144).

---

[2] In his decision, the ALJ found that since Plaintiff was "not eligible for Title Two benefits, the period to be adjudicated is from the filing date of September 20th, 2000 [the date of Plaintiff's application] to the present date" (September 26, 2003) (R. 33). Additionally, 20 C.F.R. §§ 416.330, 416.335, and 416.501 provide that Social Security Insurance benefits may not be made for any period that precedes the month in which the application for SSI is filed.

2

On July 24, 1997, Plaintiff sustained the following injuries in an automobile accident: closed head injury, blunt chest injury, blunt abdominal injury, grade four splenic laceration, right femur fracture, right pelvic fractures, nasal fracture, fracture of the right frontal bone extending into the frontal sinuses, right superior orbital rim fracture, depressed left anterior maxillary sinus fracture, and right mandible fracture. A splenectomy, intramedullary rodding of the right hip, intramaxillary fixation open reduction internal fixation of bilateral mandible fractures, and open reduction internal fixation of the supraorbital ridge fracture were performed on Plaintiff at Charleston Area Medical Center (R. 118). A CT scan of Plaintiff's head was "generally unremarkable," and Plaintiff's Glasgow Coma Scale was scored at three (R. 128). Plaintiff was released to home on August 15, 1997 (R. 118). He was prescribed Tylenol No. 3, Cipro 500mg, Bactrim, and Vancomycin (R. 119).

On December 15, 1997, William Fremouw, Ph.D., completed a psychological interview of Plaintiff (R. 225-27). Dr. Fremouw observed Plaintiff walked with a severe limp and was unsteady. Plaintiff reported his sleep patterns varied, his appetite was good, he cried because of the death of his son, in the July 24, 1997, motor vehicle accident, he had low energy, his mood varied, he was not suicidal or homicidal, he had no phobias or panics, he had post-traumatic stress syndrome symptoms, and he had no memory of the accident. Plaintiff reported he took penicillin because of the removal of his spleen and he attended physical therapy twice weekly (R. 225).

Plaintiff informed Dr. Fremouw that he had no history of psychiatric care. Dr. Fremouw observed Plaintiff was "serious, but friendly" during the evaluation. Dr. Fremouw found Plaintiff was coherent, logical, and oriented. Plaintiff's mood was reported "'as usual – down.'" Plaintiff could remember three of three objects from memory after five minutes, could recall five digits

3

forward and three backwards, and could do serial three calculations. Dr. Fremouw administered the WAIS-R test and Plaintiff scored the following: Verbal Scale IQ was 73; his Performance Scale IQ was 75; and his Full Scale IQ was 73 (R. 226). The WRAT-III was administered, and Plaintiff scored as follows: reading – second grade; spelling – third grade; arithmetic – second grade (R. 226-27). Plaintiff stated his subjective symptoms were "trouble with my leg." Dr. Fremouw's objective findings were for intact memory function, low achievement levels, no history of psychiatric care, and not medicating with psychotropic medications. Dr. Fremouw found the following diagnostic impressions: Axis I – no diagnosis; Axis II – borderline mental retardation; Axis III – multiple injuries from a motor vehicle accident (R. 227).

Plaintiff reported the following activities of daily living to Dr. Fremouw: rose at 9:00 a.m., sat throughout most of the day, visited with friends at his home, bathed four times per week, attended physical therapy twice weekly, and retired at 10:00 p.m. Plaintiff reported a friend did housework, cooked, and shopped. Plaintiff did not attend church or belong to any clubs. Dr. Fremouw found Plaintiff would be capable of managing monetary benefits (R. 227).

On December 30, 1997, Frank D. Roman, Ed.D., completed a Psychiatric Review Technique of Plaintiff. He found Plaintiff demonstrated "[s]ignificantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period (before age 22), or pervasive developmental disorder characterized by social and significant communicative deficits originating in the developmental period, as evidenced by at least one of the following . . . IQ=73" in the "Mental Retardation and Autism" category (R. 248). Dr. Roman found Plaintiff exhibited a slight degree of limitation in his activities of daily living and in maintaining social functioning and was often limited in his concentration, persistence, and pace. Dr. Roman

4

found insufficient evidence to support episodes of deterioration or decompensation by Plaintiff (R. 251)

Dr. Roman found Plaintiff was not significantly limited in his ability to remember locations and work-like procedures or to understand and remember very short and simple instructions. Dr. Roman found Plaintiff to be moderately limited in his ability to understand and remember detailed instructions (R. 255). Dr. Roman opined Plaintiff was not significantly limited in the following concentration and persistence abilities: carrying out very short and simple instructions, sustaining an ordinary routine without special supervision, working in coordination with or proximity to others without being distracted by them, or making simple work-related decisions. According to Dr. Roman, Plaintiff was moderately limited in his ability to carry out detailed instructions; ability to maintain attention and concentration for extended periods; and ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. Dr. Roman opined Plaintiff demonstrated no evidence of limitation in his ability to complete a normal workday or workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods (R. 255-56). Dr. Roman found Plaintiff's abilities to socially interact or adapt were either not limited or not significantly limited (R. 256).

Dr. Roman noted Plaintiff demonstrated a "depressed mood but otherwise normal functioning." He found Plaintiff's memory was intact and his current insight and judgment were average. Dr. Roman opined Plaintiff was capable of performing "routine entry level work" (R. 257).

On January 29, 1998, Charles M. Paroda, D.O., Ph.D., performed a consultative examination

5

of Plaintiff for the West Virginia Disability Determination Service (R. 232-36). Plaintiff reported he smoked one-and-one-half packages of cigarettes per day. Plaintiff informed Dr. Paroda that he did not experience headaches and that he did not take any medications. Dr. Paroda's examination revealed Plaintiff was overweight; he ambulated with a normal gait; he required no ambulatory aid; Plaintiff was comfortable standing, sitting, and in supine positions; Plaintiff's mental state appeared normal; and his intellectual functioning was normal (R. 233). Dr. Paroda's examination of Plaintiff's HEENT, neck, cardiovascular, lungs, chest, abdomen, extremities, spine, and neurological systems produced normal results (R. 233-35). Dr. Paroda's impression was for multiple trauma with a right femur fracture, closed head injury, and splenectomy. Dr. Paroda opined Plaintiff should "have a psychological evaluation" (R. 235). Dr. Paroda concluded that, "[b]ased upon the [Plaintiff's] history and appearance during the examination, constriction of interest and restriction of activities due to psychiatric problems appear unlikely. There is no evidence of deterioration of personal habits, and the [Plaintiff] is able to handle granted benefits in his own behalf" (R. 235-36).

On April 27, 1998, Samuel Goots, Ph.D., reviewed the December 30, 1997, findings of Dr. Roman and affirmed them (R. 244).

A Neuropsychological Evaluation by James F. Phifer, Ph.D., P.S.C., was conducted of Plaintiff on June 5, 6, 29, and 30, 1999, at the request of Plaintiff's counsel (R. 424-37). Plaintiff informed Dr. Phifer that his son was killed and his wife had been badly injured in the accident that had occurred two years earlier (R. 424-25). Plaintiff described his mood as "down." Plaintiff stated he had not sought any psychiatric treatment in the past, but desired to do so at that time because he needed assistance "dealing with . . . everything (that [was]) going through my mind – (the loss of) my son, my wife's (injuries), going through this (legal process)." Plaintiff stated he had

"contemplated suicide 'pretty seriously,'" but did not act on those contemplations because of his wife (R. 425).

Plaintiff complained of persistent headaches and hip pain. He described his "nerves as 'on edge.'" Plaintiff stated he slept poorly because of "memories of [his] son, that he's gone." Plaintiff informed Dr. Phifer he experienced poor appetite and difficulty with recent memory. Plaintiff smoked two packages of cigarettes per day and drank occasionally. Plaintiff stated he assisted his wife with her grooming and cooking. He stated he cared for their baby, who was ten-months old at the time of the evaluation (R. 426). Plaintiff reported to Dr. Phifer he had completed eighth grade, had earned average grades, and, in the past, had done construction work for several years, had worked as a mechanic, and had worked in a factory. At the time of the evaluation, Plaintiff was awaiting sentencing for a conviction on charges in the State of West Virginia for conspiracy to commit burglary and was incarcerated at the Preston County Jail (R. 427, 428). Additionally, Plaintiff reported his past criminal history included probation for destruction of property at the age of eighteen; incarceration for sixty days for a probation violation; probation in 1992 for burglary; and incarceration for eighteen months in 1993 for a conviction of receiving stolen property. Plaintiff stated this criminal behavior occurred because he was "in the wrong place, it was the wrong time, had bad friends . . . it was stupid." Plaintiff asserted such behavior would not happen in the future because he had common sense and was needed by his wife (R. 427).

During the evaluation conducted by Dr. Phifer, Plaintiff's affect was depressed, he was cooperative, and he had good rapport. Dr. Phifer opined Plaintiff exerted maximal effort during the evaluation and did not demonstrate symptomatology exaggeration (R. 428).

Relative to Plaintiff's auditory/verbal attention, Dr. Phifer found, through use of the Digit

Span test, that Plaintiff's passive attention was moderately to severely impaired and his active concentration was average. The test results for the Visual Memory Span showed, according to Dr. Phifer's observation, that Plaintiff's passive attention and active concentration were mildly impaired (R. 428). Relative to Plaintiff's sustained attention, Dr. Phifer noted his Attention/Concentration Index score of sixty on the Wechsler Memory Scale-Revised indicated his attention was severely impaired. The results of his WAIS-III Arithmetic test showed his sustained concentration was moderately impaired. Plaintiff's score on the Trails A test was for average sustained concentration and his score on the Trails B test was for severely impaired sustained concentration (R. 429).

Relative to Plaintiff's language functioning, Dr. Phifer found his receptive language ability was intact; found the results of the Boston Naming test indicated moderate dysnomia; and found the results of the Controlled Oral Word Association Test was in the average range (R. 429).

On the WAIS-III exam, Plaintiff scored the following: Verbal IQ of 74 (borderline range); Performance IQ of 72 (borderline range); and Full Scale IQ estimated at 72 (borderline range). Dr. Phifer opined Plaintiff's premorbid Full Scale IQ "was statistically estimated at 91," which indicated "a mild decline in decline in general intellectual functioning" (R. 429). Plaintiff scored a 71 on the Working Memory Index portion of the WAIS-III, which indicated a moderately impaired immediate memory. Plaintiff's score of 81 on the Processing Speed Index portion of the WAIS-III indicated a low average speed of mental processing. On the WRAT-3, Plaintiff scored the following: reading – fifth grade level; spelling – fifth grade level; and arithmetic – third grade level (R. 430).

Based on the Wechsler Memory Scale – Revised evaluation of Plaintiff, Dr. Phifer opined the results indicated Plaintiff's recent verbal memory was severely impaired, his immediate visual memory was mildly impaired, and his retentive visual memory was moderately impaired (R. 431).

8

On the California Verbal Learning test, Dr. Phifer found Plaintiff demonstrated his ability to acquire novel verbal material was severely impaired, and his immediate recall of stimulus words was moderately impaired (R. 431).

The results of Plaintiff's visuospatial/visuopractic functioning was evaluated by Dr. Phifer, and he found Plaintiff was low average to mildly impaired in his vision pattern identification, non-verbal reasoning, visual analysis and synthesis, simple pattern matching, non-verbal analogies, and non-verbal addition and subtraction, progressions, and intersections (R. 431). Plaintiff scored in the average range in the Booklet Category test, which measured non-verbal reasoning, logical analysis ability, and ability to profit from environmental feedback (R. 431-32). Plaintiff scored in the mildly impaired range of the Seashore Rhythm test, a measure of alertness to nonverbal auditory stimuli and sustained attention (R. 432).

Plaintiff scored the following on the Sensorimotor Function test, a neurosensory examination: slight ptosis of the right eye; grossly intact grip strength; grossly intact upper and lower extremity strength; intact sensation in extremities to light touch; complaints of numbness in the medial left ankle; intact extraocular movements; intact visual fields; and able to perform rapid alternating movements with upper extremities (R. 432). Tests of Plaintiff's hands revealed the following: Finger Tapping test – mildly impaired motor speed of right and low average motor speed in left; Grooved Pegboard test – average in both hands; and Hand Dynamometer – average in both hands (R. 432).

Dr. Phifer found Plaintiff achieved a score of 34 on the Beck Depression Inventory, which indicated an "extremely severe level of depressive symptoms characterized by persistent low mood, a loss of enjoyment in usual activities . . ., self-deprecatory attitude, suicidal thoughts without intent,

irritability, social withdrawal, indecisiveness, decreased initiative, sleep disturbance, rapid fatigability, anorexia, loss of libido, and preoccupation with somatic concerns" (R. 432-33). Dr. Phifer opined Plaintiff's results on th MMPI-2 were suggestive of "an individual who is admitting to emotional difficulties and is unsure of his own abilities for dealing with these problems" (R. 433). According to Dr. Phifer, Plaintiff's MCMI-III results were for severe elevations in the following clinical personality pattern scales: dependent, depressive, passive-aggressive, self-defeating; moderate elevation on one severe personality pattern scale (borderline); severe elevations on the following three clinical syndrome scales: anxiety disorder, dysthymic disorder, post-traumatic stress disorder; and no elevations of the severe syndromes scales (R. 434).

Dr. Phifer made the following conclusions and recommendations:

1) Evidence of persisting post-traumatic brain injury cognitive sequelae, with a mild to moderate decline in general intellectual functioning and severe declines in attention/concentration skills and recent memory (R. 435).

a) Severe declines were found in attention/concentration skills (R. 435-36).

b) Moderate to severe impairment of recent memory/new learning ability in both verbal and visual modalities (R. 436).

2) Indication of a recurrent Major Depressive episodes [sic], without full interepisode recovery, since death of his son and severe injury of his wife . . . . This depressive disorder is characterized at present by persistent low mood, a diminished capacity for pleasure . . ., a sense of hopelessness and pessimism, suicidal ideation, irritability, feelings of guilt and worthlessness, social withdrawal, and sleep disturbance. His level of depressive symptoms appears to vary over time . . . (R. 436).

3) Plaintiff did not attempt to exaggerate his cognitive deficits (R. 436).

4) Plaintiff should be referred to his treating physician for consideration of treatment with an activating antidepressant (R. 436).

5) Plaintiff should participate in cognitive remediation therapy directed at management of his attentional and memory deficits (R. 436).

10

6)      Plaintiff should seek repetitive work, with a structured job environment, the availability of supervision, and a quiet work environment with minimal distractions, and avoid work that involves frequent changing of procedures or an unpredictable work environment (R. 437).

Dr. Phifer made the following DSM-IV Diagnosis: Axis I – major depressive disorder, recurrent, without full interepisode recovery, and cognitive disorder NOS (neurocognitive disorder); Axis II – no diagnosis; Axis III – head injury; Axis IV – traumatic death of child, severe injury of spouse, incarceration; Axis V – GAF 45 (current) (R. 437).

On July 25, 1999, Alvaro Gutierrez, M.D., a neurologist, conducted an examination of Plaintiff (R. 438-40). In an August 13, 1999, letter to Plaintiff's lawyer, Mike Bee, Dr. Gutierrez summarized his findings of that evaluation. Dr. Gutierrez informed Mr. Bee that Plaintiff had experienced "chronic daily headaches" since the 1997 automobile accident. Dr. Gutierrez noted Plaintiff's headaches fluctuated "between mild to moderate to occasionally severe," he was dizzy, he experienced unsteadiness of gait, he complained of right hip pain, he was unable to lift any weight, he "had a severe prolonged grief reaction to the death of his child," and "[h]is situation [was] also compound [sic] by his present indictment" (R. 439).

Dr. Gutierrez observed Plaintiff was alert, conversational, and oriented during the interview. Plaintiff's speech and language were normal, his short term memory was normal, and his "long term memory was well preserved in areas but spotty." Dr. Gutierrez observed diminished peripheral vision in Plaintiff's right eye, but his pupils were equal, round, and reactive to light and his extraocular movements were full. Plaintiff's hearing was grossly intact. Dr. Gutierrez opined "the rest of [Plaintiff's] cranial nerves were deemed normal." During Dr. Gutierrez's motor examination of Plaintiff, he observed "normal tone and strength in the upper and lower extremities" and normal

gait (R. 439).

Dr. Gutierrez noted Plaintiff had "suffered from severe closed head injury." He wrote the following: "Taking into consideration Dr. Pheiffer's [sic] psychological evaluation, it is likely that [Plaintiff] is functioning intellectually at a lower level than he was before the accident in question. This is difficult to ascertain because we do not have estimates of his premorvid [sic] intellectual performance." Dr. Gutierrez recommended Plaintiff be treated by a ophthalmologist and undergo an MRI and EEG relative to his closed head injury. Dr. Gutierrez expressed "doubt that [Plaintiff] will recover from his posttraumatic syndrome," because it had already lasted "in excess of two years" (R. 440).

On October 24, 2000, Plaintiff was treated at Preston Memorial Hospital following another motor vehicle accident. The attending physician noted Plaintiff was alert and oriented. Plaintiff was diagnosed with multiple contusions, abrasions, and laceration to his lower lip. Three sutures were made to the lip laceration and Plaintiff was released to home with instructions to return in five to seven days for the removal of the stitches (R. 461).

Plaintiff was then treated at the Emergency Department of West Virginia University Hospital on October 24, 2000, for symptoms of "pain and some lightheadedness." Dr. Thomas H. Covey admitted Plaintiff for overnight observation. Plaintiff's cervical spine x-ray was not abnormal; Plaintiff's chest x-ray showed "no acute cardiopulmonary process"; Plaintiff's pelvis x-ray revealed "no evidence for acute injury"; Plaintiff's CT scan of his chest, abdomen, and pelvis revealed "[n]o evidence for an acute intraabdominal or pelvic injury"; Plaintiff's CT scan of his brain revealed "no evidence for an acute intracranial hemorrhage. . . . no . . . mass lesion or abnormal fluid collection"; Plaintiff's right wrist x-ray showed no fracture or dislocation (R. 468-74). Plaintiff "did well

12

overnight and was stable for discharge to home" on October 25, 2000. Plaintiff's discharge diagnosis was for blunt chest trauma, lip laceration, hand abrasions, and right wrist contusion (R. 477).

On November 28, 2000, Plaintiff filed a Personal Pain Questionnaire. Plaintiff claimed he experienced constant burning and aching pain in his hip and lower back, which was exacerbated by sitting, standing, lying down, lifting, and cold weather (R. 348). Plaintiff noted he took no medication for his pain, but treated the pain with hot baths and movement (R. 349). Plaintiff wrote he retired to bed between 9:00 p.m. or 10:00 p.m., arose between 5:00 a.m. and 6:00 a.m., and napped during the day. Plaintiff reported he cared for his wife and children (R. 350). Plaintiff noted he did not need help with his personal needs and grooming, and he prepared meals (R. 351). Plaintiff wrote he completed the lawn care and child care, performed housework and/or chores with the help of friends, but did not shop (R. 352). Plaintiff noted he drove, but he had someone take him places because he did not like to drive. Plaintiff reported he watched television ten hours per day and his hobby was watching movies (R. 353). Plaintiff wrote his pursuit of his movie-watching hobby was not changed by his condition. Plaintiff reported he was visited by relatives two times per month and received visits from friends about three times per month. Plaintiff stated he did not often leave the house; the exception was to "get things we need." He noted he did not want to be "around people verey [sic] long except my family" (R. 354). Plaintiff reported he had difficulty concentrating (R. 355).

On December 7, 2000, Plaintiff reported to the West Virginia Pain Treatment Center, having been referred to that facility for evaluation by Mike Bee, his lawyer (R. 994, 996). He was evaluated by Cyriac John, M.D., for Stanford J. Huber, M.D., for injuries sustained during the October 24,

2000, motor vehicle accident (R. 992, 993). Plaintiff complained of a "sharp to aching neck pain radiating into his right shoulder and occipital area," which was "worse with movement of the neck and cervical extension." Plaintiff reported he had ceased smoking. During the examination, Plaintiff was alert and oriented. Dr. John observed the following: heart examination regular; lungs normal; abdomen normal; no gross focal, motor, sensory deficits; mild decrease in strength on abduction of shoulder and elbow flexion secondary to pain; 4/5 strength; decreased cervical range of motion; cervical flexion was normal range of motion; and pain on cervical extension and lateral side bending (R. 992). Dr. John diagnosed cervical sprain/strain syndrome and possible cervical facet syndrome. Dr. John recommended a CT scan of Plaintiff's neck be obtained and he suggested cervical epidural steroid injections to Plaintiff as treatment. He prescribed Neurontin (R. 993).

On March 2, 2001, Dentist Dr. John M. Carson, DDS completed a head and neck examination of Plaintiff (R. 1034-45). Plaintiff presented with headaches, right lower jaw pain, neck pain, and lower back pain. Dr. Carson assessed "BL temporalis tendonitis"; "craniofacial pain secondary to severe myospasm"; "cervicogenic pain with secondary occipital neuralgia"; and point tenderness at right angle of mandible (R. 1045).

On February 5, 2001, Plaintiff returned to the West Virginia Pain Treatment Center with complaints of pain in his neck and shoulders, which was unchanged from his December, 2000, visit to that facility. Plaintiff stated his pain was aggravated by his turning his head and was relieved by "nothing." Plaintiff was diagnosed with cervical sprain/strain (R. 990). Zanaflex was prescribed to Plaintiff by Dr. Richard M. Vaglienti (R. 991).

On February 6, 2001, Arturo Sabio, M.D., completed a consultative evaluation of Plaintiff for the West Virginia Disability Determination Service (R. 403-08). Plaintiff's chief complaints

were of back pain and pain in his right leg. Plaintiff informed Dr. Sabio that the spinal pain was constant and it worsened with repetitive bending, stooping, prolonged sitting and riding in a car for more than thirty miles. Plaintiff stated prolonged ambulation exacerbated the pain in his right leg. Plaintiff reported he could lift up to thirty pounds. Plaintiff informed Dr. Sabio he experienced difficulty sleeping due to pain and he treated his pain with over-the-counter medication (R. 403).

No medical records were reviewed by Dr. Sabio. Plaintiff reported his respiratory, cardiovascular, gastrointestinal, genitourinary, and neurological systems were normal (R. 404). Plaintiff informed Dr. Sabio he was medicated with Zanaflex and Neurontin. Dr. Sabio observed Plaintiff to be well developed, well nourished, and oriented. He opined Plaintiff ambulated with a normal gait and was stable at station. Dr. Sabio opined Plaintiff was moderately obese (R. 405). Dr. Sabio's examination of Plaintiff's HEENT, neck, cardiovascular, chest, abdomen, extremities, spine, and neurological systems produced normal results (R. 405-07). Dr. Sabio observed tenderness over the spinous processes of the cervical spine, thoracic spine, and lumbar spine, but he did not observe kyphosis, scoliosis, or paravertebral muscle spasm (R. 406). He found the ranges of motion of Plaintiff's spine and all extremities were "entirely normal" and his deep tendon reflexes were normal (R. 408). Dr. Sabio found the following impressions: chronic back strain, history of multiple fractures, pain in the right thigh secondary to hardware fixation, and moderate obesity (R. 407).

Also on February 6, 2001, x-rays were made of Plaintiff's right femur and lumbar spine. The x-ray of Plaintiff's right femur showed a "well healed fracture" and no "asceptic necrosis." "Some post traumatic degenerative arthrosis" was shown on the distal end of Plaintiff's femur. The x-ray of Plaintiff's lumbar spine was normal (R. 411).

On February 27, 2001, Uma Reddy, M.D., a state-agency physician, completed a Physical Residual Functional Capacity Assessment of Plaintiff relative to his chronic back pain. Dr. Reddy found Plaintiff could occasionally lift and/or carry fifty pounds, frequently lift and/or carry twenty-five pounds, stand and/or walk for a total of about six hours in an eight-hour workday, sit for a total of about six hours in an eight-hour work day, and push and/or pull unlimited (R. 414). Dr. Reddy found Plaintiff was occasionally limited in his ability to climb, balance, stoop, kneel, crouch, and crawl (R. 415). Plaintiff was found to have no manipulative, visual, or communicative limitations (R. 416-17). Dr. Reddy found Plaintiff should avoid concentrated exposure to vibration and hazards, but had no exposure limitations to extreme cold or heat, wetness, humidity, noise, or fumes (R. 417). Dr. Reddy reduced Plaintiff's RFC to medium (R. 418).

On May 8, 2001, the Physical Residual Functional Capacity Assessment completed by Dr. Reddy of Plaintiff was reviewed and affirmed by Fulvio R. Franyutti, M.D. (R. 420).

On August 27, 2001, Plaintiff presented to the Morgantown Pastoral Counseling Center. Ellen McBride was the clinician who interviewed Plaintiff. Plaintiff stated he was disabled "due to a closed head injury in an auto accident in '97." Plaintiff informed Ms. McBride his wife was disabled and his son was killed in the same accident. Plaintiff stated he and his wife were the parents of two children, aged three and two years. Plaintiff presented "due to PTSD symptoms and also due to dealing with effects from another wreck last fall." Plaintiff stated he had no memory of the 1997 automobile accident. Plaintiff informed Ms. McBride that he was not taking any medication. Plaintiff stated he wanted "to work on resolving the PTSD symptoms" and that he would be receiving a "settlement . . . of $750,000" from the 1997 accident and hoped that would "help him to bring closure to this." Ms. McBride noted Plaintiff exhibited no evidence of psychosis, thought

disorder, suicidal ideation, or homicidal ideation. Plaintiff demonstrated some depressive symptoms, but refused medication. Ms. McBride ordered a follow-up session in two weeks (R. 979).

Plaintiff did not attend scheduled counseling session at Morgantown Pastoral Counseling Center on September 10, 2001, or September 21, 2001 (R. 980).

On October 17, 2001, Plaintiff received a nerve block/trigger point injection from Dr. Vaglienti (R. 984).

On November 20, 2001, Plaintiff received a cervical epidural from Dr. Vaglienti (R. 983).

On December 11, 2001, Dr. Vaglienti wrote a letter to "Ms. Mann and Mr. Martin" of the Clinical Law Program at the West Virginia University College Law, the organization that was providing legal representation to Plaintiff, relative to his treatment of Plaintiff at the West Virginia Pain Treatment Center. Dr. Vaglienti wrote that Plaintiff's "pain has not responded to multiple interventional treatments, or to medications." Dr. Vaglienti opined there was "no question in [his] mind that [Plaintiff] suffer[ed] from a significant amount of pain," which had been unsuccessfully treated at the Pain Treatment Center. Based on that observation, Dr. Vaglienti further found, "to a reasonable degree of certainty, that [Plaintiff] [was] disabled." Dr. Vaglienti offered to testify on behalf of Plaintiff (R. 981).

On January 29, 2002, Plaintiff received a cervical epidural block from Dr. Huber (R. 982).

On May 3, 2003, Charles Rosen, M.D., Ph.D., a neurosurgeon, evaluated Plaintiff at the request of Dr. Vaglienti. Plaintiff informed Dr. Rosen he experienced neck and bilateral arm pain. Plaintiff described his back pain as "sharp, burning pain which [was] constant" and which radiated from his cervical region into his anterior arms. Plaintiff stated he experienced numbness and tingling in his arms, but no weakness in his extremities. Plaintiff asserted prolonged sitting and walking

17

worsened his symptoms and that his symptoms were relieved when he shifted positions. Plaintiff informed Dr. Rosen he had not received any physical therapy for his condition and he did not receive "adequate relief" from the injections provided by the West Virginia Pain Treatment Center (R. 1057).

Dr. Rosen observed Plaintiff was in no apparent distress, was oriented and alert, had smooth and steady gait and station, had 5/5 muscle strength bilaterally in upper and lower extremities, had normal muscle tone in upper and lower extremities, had normal sensation, had "downgoing Babinski," had negative clonus, had negative Spurling's, had smooth and accurate coordination, and had normal attention span and concentration (R. 1057-58). Dr. Rosen reviewed Plaintiff's January 2001 MRI and noted "mild degenerative changes throughout the cervical spine without any focal disk herniation, no spondylosis, or signs of nerve root or cord compression." Dr. Rosen's diagnosis was for cervical disk degeneration. Dr. Rosen suggested physical therapy, stretching, conditioning, and the use of nonsteroidal anti-inflammatory medications as methods to treat Plaintiff's condition (R. 1058).

At the June 24, 2003, administrative hearing, Plaintiff testified he had difficulty remembering and focusing. He stated he had headaches and pain in his neck (R. 1145). Plaintiff testified he took Hydrocodone two or three times daily and applied ice to his neck for pain and took Advil and Tylenol for headaches (R. 1146, 1148, 1149). Plaintiff stated his vision in his right eye was blurred (R. 1151). Plaintiff testified he experienced burning pain in his hips (R. 1153). Plaintiff stated he drove three or four times per week for ten to sixteen miles one way (R. 1134). Plaintiff testified he had renewed his license in 2000 after his release from prison. He stated a friend had read the driver's manual to him a couple times, and he was able to pass the written test. Plaintiff also stated he passed

the vision test (R. 1173). Plaintiff testified that his activities of daily living were as follows: rose in the morning, sat and watched television, helped his children and wife, prepared cereal for his children's breakfasts, and played with his children (R. 1150). Plaintiff stated his friends visited "all the time" and members of his family also visited with him (R. 1152). Plaintiff stated he did not have "a bunch" of difficulty walking on level ground and could walk for a couple minutes before having to stop and rest (R. 1158). Plaintiff testified he could not stand for longer than "a few minutes" because it caused pain in his hips (R. 1159, 1160). Plaintiff stated he could lift his twenty-pound daughter and his thirty-pound son (R. 1162). Plaintiff testified he could carry a gallon of milk in each hand, but "not that far" (R. 1162). Plaintiff stated his brothers and sisters helped his wife, with the house cleaning, with the cooking, and with maintenance of the yard (R. 1163-64). Plaintiff testified he had not contemplated obtaining work because of his "condition" and he had not sought job training because he was unsure if he "could focus that long . . . with the problems" (R. 1154).

Upon questioning by his attorney, Plaintiff testified his headaches occurred "maybe a couple times a day" and lasted about twenty minutes before they began easing (R. 1168). Plaintiff stated his neck pain was "stinging" and radiated into his arms and hands, causing his hands to become numb. Plaintiff testified that lying down, sitting, and/or standing worsened his neck pain (R. 1170). Plaintiff agreed with his attorney that he had been depressed. He stated he had thought of "ending" his life several times, but did not because of his wife and children (R. 1177). Plaintiff testified, when questioned by his lawyer, that he became angry easily, he had "problems" remaining focused when watching movies, his sleep was interrupted by pain, and he could not nap (R. 1178-79).

James Hodgson, an individual who had known the Plaintiff for twenty years and who had

become reacquainted with Plaintiff two and one-half years prior to the administrative hearing, testified (R. 1190-91). He stated he phoned Plaintiff twice daily and visited Plaintiff at Plaintiff's house "almost every day" (R. 1190, 1192). Mr. Hodgson testified he traveled to the store with Plaintiff and helped him around the house. Mr. Hodgson testified Plaintiff had "a short fuse," experienced pain in his leg and neck, and was forgetful (R. 1194-93, 1196).

L. Leon Reid, Ph.D., testified at the administrative hearing that he had no prior contact with Plaintiff but had reviewed his medical records (R. 1198-99). Dr. Reid had prepared a summary of Plaintiff's medical records (R. 2003, 1004-09). In reviewing the records of Dr. Phifer, Dr. Reid testified as follows:

> . . . he gave him a GAF of 45, which basically it would say he could not hold a job. But Dr. Phifer also suggested in the same report that he should go get a job. . . . [W]e have an individual who has a borderline intellectual IQ. This has been established by Dr. Phifer and what you see with this individual, of course, is limited achievement in many of the tests that were given. You'd expect that. . . . Dr. Phifer also thought he had at one time a maximum IQ of 91. I really do not see that. I think the problem is behavior going back to really teenage years perhaps. The trouble he's had with legal authorities and a general behavior, the culture in which he comes from, I would suggest that he's only been in the borderline area. There is no evidence in the file at all about a major depression. There is no such evidence. He has not been treated at all for a depression (R. 1201-02).

Dr. Reid further testified:

> The closed head injury factors basically brain x-rays, CT scans, MVA or MVA shows no abnormalities and actually the achievement from within six months after the injury apparently there was no significant brain dysfunction. The other factor which is in the record is this pain factor and this is as, as would be expected from the physical injuries, but he has not had any great amount of treatment therein. Even Dr. Vagliante [sic], December 11, 2001, Exhibit B12-F, declared that his pain has not been significantly treated. Yet Dr. Fanuti [sic], February 1998, prior to that date, that's Exhibit 12F, found that he could do an RFC of medium. So I don't see this gentlemen meeting any, or equally any listing, . . . under 12 under mental disorder (R. 1202-03).

20

Dr. Reid testified he was familiar with the criteria that was necessary for "equalling [sic] a listing," and that Plaintiff did not have "signs, symptoms and laboratory findings that equal in severity a listed impairment under Section 12.00" (R. 1203). Dr. Reid testified Plaintiff was psychologically "the same now as he was before" the motor vehicle accidents (R. 1203). Dr. Reid stated he thought Plaintiff "should only do simple, routine kinds of activities," work with one to three people and not in a crowd or as part of a team, work away from the public, work in a temperature-controlled environment, work in a setting in which vibrations and noises were average or less than average, and perform work in which speed and efficiency are important (R. 1204).

Dr. Reid noted that Dr. Gutierrez's August 13, 1999, letter to Attorney Mike Bee contained a conflict in that he wrote Plaintiff suffered from a "post traumatic syndrome characterized by decrease in attention and concentration, poor recall, a rather constant headache, episodes of dizziness, lightheadedness and unsteadiness when walking" but that Plaintiff's "language, speech, and memory were intact" (R. 1208). Dr. Reid also testified that Dr. Gutierrez's opinion that Plaintiff experienced "mild to moderate, but occasionally severe, bearable and even severe unbearable" headaches, "protracted dizziness, unsteadiness of gait, . . . right hip pain, and unable to lift any weights" was not documented in the record (R. 1209).

On August 15, 2003, Dr. Phifer corresponded with Randal Minor, Plaintiff's counsel, in response to specific questions asked of Dr. Phifer by Mr. Minor in a July 8, 2003 letter (R. 1059-60). Dr. Phifer wrote that it was his "professional opinion that [Plaintiff] does meet the criteria set forth in 12.02 for Organic Mental Disorder. [Plaintiff] does exhibit psychological (both cognitive and emotional) abnormalities associated with dysfunction of the brain." Dr. Phifer also wrote that Plaintiff's "GAF rating of 45 included both the psychological impairment that was reactive in nature

21

as well as the cognitive impairments related to his closed head injury." Dr. Phifer noted he had

hoped that, "with time and adequate psychiatric treatment, that [Plaintiff's] reactive emotional

symptoms might improve (at least sufficiently to permit exploration of the possibility of returning

to work) but I did not feel that his cognitive status would improve" (R. 1059).

Also in the August 15, 2003, letter to Mr. Minor, Dr. Phifer addressed Plaintiff's "'loss of

previously acquired functional abilities.'" He wrote:

> With regard to estimating [Plaintiff's] premorbid level of functioning, demographic
> variables, such as social class and education, are known to be closely related to scores
> on intelligence tests and, accordingly, can be used to provide the clinician with
> indicators of an individual's premorbid level of intellectual functioning . . . . Based
> upon his sociodemographic data and academic/occupational history, [Plaintiff's] pre-
> morbid Full Scale IQ was estimated at 91 (Average range.). Although certain
> measures of current functioning are commonly used to assess premorbid functioning
> . . ., these are not appropriate for use in cases of severe brain injury, as these
> functions would be altered by a severe brain injury. Accordingly, while this
> estimated IQ may be a slight overestimate, it is still probable that [Plaintiff's]
> premorbid ability was in the Low Average range. A second issue that must be
> addressed is that, even if one assumes a premorbid level in the borderline range . . .,
> as suggested by Dr. Reid, [Plaintiff's] functioning in numerous areas was
> substantially below this level, reaching over three standard deviations below the
> mean . . . . These scores clearly do represent a decline relative to his premorbid level
> of functioning, thereby constituting a "loss of previously acquired functional
> abilities" (R. 1059-60).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's

regulations at 20 C.F.R. § 416.920 (1997), ALJ Moon made the following findings:

1. The claimant has not engaged in substantial gainful activity since the alleged onset
   of disability.

2. The claimant has an impairment or a combination of impairments considered
   "severe" based on the requirements in the Regulations 20 CFR § 416.920(b).

3. These medically determinable impairments do not meet or medically equal one of the

22

listed impairments in Appendix 1, Subpart P, Regulation No. 4.

4.     The undersigned finds the claimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision.

5.     The undersigned has carefully considered all of the medical opinions in the record regarding the severity of the claimant's impairments (20 CFR § 416.927).

6.     The claimant has the following residual functional capacity: medium work. The claimant can sit for six hours out of an eight-hour workday and stand or walk for up to six hours out of an eight-hour workday. Work should be unskilled, simple and routine and consist of one to three step tasks. Employment should have minimal interaction with the public. This is defined as ten percent or less of the time, the claimant has contact with the public. The claimant should have only occasional contact with co-workers who should not number more than five. Work cannot expose the claimant to high concentration of dusts, fumes, gases or noise.

7.     The claimant has no past relevant work (20 CFR § 416.965).

8.     The claimant is a "younger individual" (20 CFR § 416.963).

9.     The claimant has "a limited education" (20 CFR § 416.964).

10.    The claimant has the residual functional capacity to perform a significant range of medium work (20 CFR § 416.967).

11.    Although the claimant's exertional limitations do not allow him to perform the full range of medium work, using Medical-Vocational Rule 203.25 as a framework for decision-making, there are a significant number of jobs in the national economy that he could perform. Examples of such jobs include work as a packer, with 102,000 jobs in the national economy and 169 jobs in the regional economy; as an equipment washer, with 136,900 jobs in the national economy and 169 jobs in the regional economy; and as a commercial cleaner, with 1,638,700 jobs in the national economy and 2,300 in the regional economy.

12.    The claimant was not under a "disability," as defined in the Social Security Act, at any time through the date of this decision (20 CFR § 416.920(f)) (R. 43-44).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to

determining whether "the findings of the Secretary are supported by substantial evidence and whether the correct law was applied." _Hays v. Sullivan_, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing court must also consider whether the administrative law judge applied the proper standards of law: "A factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## B. Contentions of the Parties

Plaintiff contends:

1. The Secretary's decision that [Plaintiff] is not disabled is not supported by substantial evidence.

   A. Listing 12.02 for Organic Mental Disorder
   B. Dr. Phifer's, Dr. Gutierrez's, and Dr. Reid's Opinions
   C. Pain and Credibility
   D. Witness Testimony
   E. Dr. Vaglienti's Opinion
   F. Combined effect of Impairments

2. The Office of Hearings and Appeals failed to comply with the Appeals Council's directive to fully develop the record with respect to [Plaintiff's] mental impairment.

The Commissioner contends:

1. Substantial evidence supports the Commissioner's final decision that Plaintiff was not disabled under the Act.

## C. Listing 12.02

Plaintiff first argues that he meets Listing 12.02 for Organic Mental Impairments. Listing 12.02 provides:

*Organic Mental Disorders:* Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state <u>and loss of previously acquired functional abilities.</u>

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.

A. <u>Demonstration of a loss of specific cognitive abilities or affective changes</u> and the medically documented persistence of at least one of the following:

1. Disorientation to time and place; or

2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or

3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or

4. Change in personality; or

5. Disturbance in mood; or

6. Emotional lability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or

7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;

<u>AND</u>

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration.

(Emphasis added). Dr. Phifer opined Plaintiff met the Listing. Dr. Reid disagreed, opining Plaintiff did not even have an Organic Mental Disorder, much less at Listing level. Necessary to such a

diagnosis is a finding that the individual has suffered a loss of previously acquired functional abilities. Dr. Phifer found Plaintiff's pre-accident IQ would have been approximately 91, whereas his current IQ was approximately 73. Dr. Reid, while agreeing that Plaintiff's current IQ was 73, opined that Plaintiff had functioned at that level even before the accident. There were no pre-accident IQ scores to review.

Dr. Phifer indicated he based his estimate of Plaintiff's pre-accident IQ on Plaintiff's "sociodemographic status and academic and vocational history" (R. 435). As the ALJ noted, however, Dr. Phifer did not explain how these factors supported a 91 IQ. Plaintiff quit school in the eighth grade. This means he was either permitted to quit school at 14, or, as is more likely, turned 16 in the eighth grade. If the latter, the implication is that Plaintiff was "held back" at least once in grade school, probably twice. Additionally, as Dr. Reid and the ALJ noted, Plaintiff had almost no reported income in the ten years between quitting school and the accident. His only reported income came in the year just prior to the accident, during which he worked as a material handler in a molding factory and as a laborer in a chicken processing plant, "picking boxes of chicken up and putting ice in them and covering them and putting them on a pallet" (R. 1143). Plaintiff also testified he worked "under the table" (for cash) taking parts off cars in a junkyard.

Based on the above, Dr. Reid opined Plaintiff most likely functioned at about the same level before the accident as after. This opinion is inconsistent with Dr. Phifer's. As the Fourth Circuit stated in Hays v. Sullivan, 907 F.2d 1453 (4th Cir. 1990):

> Ultimately, it is the duty of the administrative law judge reviewing a case, and not the responsibility of the courts, to make findings of fact and to resolve conflicts in the evidence. _King v. Califano,_ 599 F.2d 597, 599 (4th Cir.1979) ("This Court does not find facts or try the case _de novo_ when reviewing disability determinations.");

> *Seacrist v. Weinberger,* 538 F.2d 1054, 1056-57 (4th Cir.1976) ("We note that it is
> the responsibility of the Secretary and not the courts to reconcile inconsistencies in
> the medical evidence, and that it is the claimant who bears the risk of
> nonpersuasion."); *Blalock v. Richardson,* 483 F.2d at 775 ("[T]he language of §
> 205(g) precludes a *de novo* judicial proceeding and requires that the court uphold the
> Secretary's decision even should the court disagree with such decision as long as it
> is supported by 'substantial evidence.' ").

The undersigned finds substantial evidence supports the ALJ's according more weight to Dr. Reid's opinion than Dr. Phifer's regarding Listing 12.02. The undersigned therefore also finds substantial evidence supports the ALJ's according more weight to Dr. Reid's opinion than to Dr. Gutierrez's. First, the evidence does not support Plaintiff's contention that Dr. Gutierrez was a treating physician, at least at the time of his opinion. Second, Dr. Gutierrez based his opinion in large part on Dr. Phifer's report. Third, while opining Plaintiff was "likely" functioning at a lower level than before the accident, he also admitted: "This is difficult to ascertain because we do not have estimates of his premorvid [sic] intellectual performance" (R. 440).

The undersigned therefore finds substantial evidence supports the ALJ's determination that Plaintiff did not meet Listing 12.02.

### D. Other Mental Impairments

Although the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff did not have an organic mental disorder and did not meet Listing 12.02, there is no dispute that Plaintiff has at least one severe mental impairment – borderline intellectual functioning. Different examining and consulting physicians and psychologists offered conflicting opinions regarding additional mental impairments Plaintiff might have. Dr. Fremouw diagnosed Borderline Mental Retardation. Dr. Roman and Dr. Goots, the State agency reviewing psychologists, also found Plaintiff had Borderline Mental Retardation, and opined Plaintiff would "often" experience

27

deficiencies of concentration, persistence or pace. Dr. Phifer diagnosed Plaintiff with Recurrent Major Depressive Disorder and Cognitive Disorder. Dr. Reid in his written Report found Plaintiff had Borderline Intellectual Functioning. He disagreed with Dr. Phifer's diagnosis of Major Depression, opining "[t]he more appropriate DX would be Adjustment Disorder, or perhaps Dysthymia." (Emphasis added).

The ALJ first noted in his Decision that Dr. Reid testified Plaintiff had "no significant psychological problems." In the next sentence the ALJ stated Dr. Reid "noted Dr. Phifer's many reported tests and also indicated that the results indicated only mild to moderate depression rather than the major depressive disorder reported by Dr. Phifer." In a subsequent sentence, however, the ALJ stated that Dr. Reid "indicated that the claimant did not have any psychological impairments other than borderline intellectual functioning."

The ALJ found Plaintiff's only mental impairment was Borderline Intellectual Functioning, which he found to be a severe impairment. The undersigned finds several errors in this regard. The ALJ "accepted" Dr. Reid's opinion. Yet Dr. Reid found Plaintiff also had either an Adjustment Disorder or Dysthymia, or "mild to moderate depression," any or all of which should therefore have been considered as at least "medically determinable impairments," Or should have been further investigated. 20 C.F.R. §404.1520a provides, in pertinent part:

> . . . .
> [W]e must first evaluate your pertinent symptoms, signs, and laboratory findings to determine whether you have a medically determinable mental impairment(s) . . . . If we determine that you have a medically determinable mental impairment(s), we must specify the symptoms, signs, and laboratory findings that substantiate the presence of the impairment(s) and document our findings in accordance with paragraph (e) of this section.
>
> B.      (2) We must then rate the degree of functional limitation resulting from the

impairment(s) in accordance with paragraph (c) of this section and record our findings as set out in paragraph (e) of this section.

(c) *Rating the degree of functional limitation.* (1) Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication, and other treatment.

(2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.

(3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listing of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living; social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

(d) *Use of the technique to evaluate mental impairments.* After we rate the degree of functional limitation resulting from your impairment(s), we will determine the severity of your mental impairment(s).

(1) If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities (see §404.1521).

(2) If your mental impairment(s) is severe, we will then determine if it meets or is equivalent in severity to a listed mental disorder. We do this by comparing the medical findings about your impairment(s) and the rating of the degree of functional limitation to the criteria of the appropriate listed mental disorder. We will record the

presence or absence of the criteria and the rating of the degree of functional limitation on a standard document at the initial and reconsideration levels of the administrative review process, or in the decision at the administrative law judge hearing and Appeals Council levels (in cases in which the Appeals Council issues a decision). See paragraph (e) of this section.

(3) If we find that you have a severe mental impairment(s) that neither meets nor is equivalent in severity to any listing, we will then assess your residual functional capacity.

(e) *Documenting application of the technique.* . . . .

(2) At the administrative law judge hearing and Appeals Council levels, the written decision issued by the administrative law judge or Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

There is no dispute that Plaintiff has borderline intellectual functioning, and Dr. Reid (upon whom the ALJ relied) also opined he had either an adjustment disorder, a dysthymic disorder or mild to moderate depression. The undersigned finds the ALJ did not follow the required technique when considering these medically determinable mental impairments.

The undersigned therefore finds substantial evidence does not support the ALJ's determination regarding Plaintiff's alleged mental impairments.

### E. Pain and Credibility

Plaintiff next argues the ALJ did not properly credit his reports of pain and limitations; ignored the corroborating testimony of Mr. Hodgson; and "never really explained why he completely disregarded" Dr. Vaglienti's report regarding Plaintiff's pain. Defendant contends Plaintiff's subjective complaints were not entitled to full credibility; that the ALJ did not "ignore" Mr. Hodgson's testimony; and that the ALJ discounted Dr. Vaglienti's opinion because it was

inconsistent with other evidence and not well supported by the findings at the Pain Center in December 20000 and February 2001.

The Fourth Circuit has held that "[b]ecause he had the opportunity to observe the demeanor and to determine the credibility of the claimant, the ALJ's observations concerning these questions are to be given great weight." Shively v. Heckler, 739 F.2d 987, 989 (4th Cir.1984) (citing Tyler v. Weinberger, 409 F.Supp. 776 (E.D.Va.1976)).

The Fourth Circuit has developed a two-step process for determination of whether a person is disabled by pain or other symptoms as announced in Craig v. Chater, 76 F. 3d 585 (4th Cir. 1996):

> 1) For pain to be found to be disabling, there must be shown a medically determinable impairment which could reasonably be expected to cause not just pain, or some pain, or pain of some kind or severity, but *the pain the claimant alleges she suffers*. The regulation thus requires at the threshold a showing by objective evidence of the existence of a medical impairment "which could reasonably be expected to produce the actual pain, in the amount and degree, alleged by the claimant." *Cf. Jenkins*, 906 F.2d at 108 (explaining that 42 U.S.C. § 423(d)(5)(A) requires "objective medical evidence of some condition that could reasonably be expected to produce the pain alleged"). *Foster*, 780 F.2d at 1129 . . . .

> 2) It is only after a claimant has met her threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the pain claimed, *that the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work, must be evaluated*, *See* 20 C.F.R. §§ 416.929(c)(1) & 404.1529(c)(1). Under the regulations, this evaluation must take into account not only the claimant's statements about her pain, but also "all the available evidence," including the claimant's medical history, medical signs, and laboratory findings, *see id.*; any objective medical evidence of pain (such as evidence of reduced joint motion, muscle spasms, deteriorating tissues, redness, etc.). *See* 20 C.F.R. §§ 416.929(c)(2) & 404.1529(c)(2); and any other evidence relevant to the severity of the impairment, such as evidence of the claimant's daily activities, specific descriptions of the pain, and any medical treatment taken to alleviate it. *See* 20 C.F.R. § 416.929(c)(3) & 404.1529(c)(3). (Emphasis added).

Craig, supra at 594.

The ALJ here found Plaintiff met the first, threshold step – he found Plaintiff had chronic back strain, obesity, and was status post multiple fractures, all of which he labeled "severe." A review of the Decision shows the ALJ took into account the factors at the second step. He discussed Plaintiff's medical history, the medical signs and laboratory findings; the medical evidence of pain; Plaintiff's daily activities; descriptions of the pain; and medical treatment he took to alleviate it.

Plaintiff objects, however that the ALJ ignored the testimony of Mr. Hodgson, Plaintiff's friend and witness. The ALJ did not ignore Mr. Hodgson's testimony. He noted that Mr. Hodgson was Plaintiff's friend, that he stated he had known Plaintiff for 20 years and that he saw him virtually every day to see if he needed help or items from the store. He considered Mr Hodgson's testimony that Plaintiff now had a short fuse and his temperament had changed since the accident and that, when driving with Plaintiff, Plaintiff had occasionally forgotten where they were going

Plaintiff also argues that the ALJ "never really explained why he completely disregarded" Dr. Vaglienti's report regarding Plaintiff's pain. Again, the undersigned does not find the ALJ "completely disregarded" Dr. Vaglienti's report. He noted Dr. Vaglienti's opinion that Plaintiff was disabled, primarily due to pain. The ALJ accepted that Plaintiff experienced pain from his accidents, but the level of pain alleged was not supported by the record. The ALJ went on to state that there were few treatment notes from Dr. Vaglienti to support his own statements and little objective evidence of injury. Plaintiff's recent neurological exam found only mild cervical degenerative disease. Radiographic studies supported hip pain only due to the hardware used in the repair of the leg, and did not disclose any back impairment. As the ALJ noted, Plaintiff had begun treating at the Pain Treatment Center in December 2000. At an examination at that time, there was no gross focal, motor or sensory deficit. There was a mild decrease in strength or abduction of the shoulder and

32

elbow flexion secondary to pain. Strength was 4/5. There was a decreased cervical range of motion except in cervical flexion, which was normal. He was diagnosed with cervical sprain/strain syndrome and a possible cervical facet syndrome.

After that examination, the record shows Plaintiff presented to the Pain Clinic in February 2001, when he was diagnosed with cervical sprain-strain and prescribed Zanaflex; in October 2001, when he received a trigger point injection; and in November 2001, when he received a cervical epidural. Dr. Vaglienti wrote his opinion that Plaintiff was disabled shortly thereafter. It therefore appears according to the record that Plaintiff attended the Pain Clinic on approximately four occasions over the course of a year, and received one medication and two injections, before Dr. Vaglienti wrote his opinion that there was "no question in [his] mind that [Plaintiff] suffer[ed] from a significant amount of pain," which had been unsuccessfully treated at the Pain Treatment Center, and that, "to a reasonable degree of certainty, [Plaintiff] [was] disabled."

First, Dr. Vaglienti's opinion that Plaintiff was disabled is an issue reserved to the commissioner and therefore is entitled to no significant weight. 20 C.F.R. § 404.1527(e) states:

> e) *Medical source opinions on issues reserved to the Commissioner.* Opinions on some issues, such as the examples that follow, are not medical opinions, as described in paragraph (a)(2) of this section, but are, instead, opinions on issues reserved to the Commissioner because they are administrative findings that are dispositive of a case; *i.e.,* that would direct the determination or decision of disability.

> A.    (1) *Opinions that you are disabled.* We are responsible for making the determination or decision about whether you meet the statutory definition of disability. In so doing, we review all of the medical findings and other evidence that support a medical source's statement that you are disabled. A statement by a medical source that you are "disabled" or "unable to work" does not mean that we will determine that you are disabled.

The ALJ did consider Dr. Vaglienti's opinion under 20 C.F.R.§404.1527, which provides:

(d) *How we weigh medical opinions.* Regardless of its source, we will evaluate every medical opinion we receive. Unless we give a treating source's opinion controlling weight under paragraph (d)(2) of this section, we consider all of the following factors in deciding the weight we give to any medical opinion

(1) *Examining relationship.* Generally we give more weight to the opinion of a source who has examined you than to the opinion of a source who has not examined you.

(2) *Treatment relationship.* Generally, we give more weight to opinions from your treating sources, since these sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations. If we find that a treating source's opinion on the issue(s) of the nature and severity of your impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight. When we do not give the treating source's opinion controlling weight, we apply the factors listed in paragraphs (d)(2)(i) and (d)(2)(ii) of this section, as well as the factors in paragraphs (d)(3) through (d)(6) of this section in determining the weight to give the opinion. We will always give good reasons in our notice of determination or decision for the weight we give your treating source's opinion.

(i) *Length of the treatment relationship and the frequency of examination.* Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the treating source's medical opinion. When the treating source has seen you a umber of times and long enough to have obtained a

34

longitudinal picture of your impairment, we will give the source's opinion more weight than we would give it if it were from a non treating source.

      (ii) *Nature and extent of the treatment relationship.* Generally, the more knowledge a treating source has about your impairment(s) the more weight we will give to the source's medical opinion. We will look at the treatment the source has provided and at the kinds and extent of examinations and testing the source has performed or ordered from specialists and independent laboratories.

(3) *Supportability.* The more a medical source presents relevant evidence to support an opinion particularly medical signs and laboratory findings, the more weight we will give that opinion. . . .

(4) *Consistency.* Generally, the more consistent an opinion is with the record as a whole, the more weight we will give to that opinion.

In his December 2001 letter to counsel Dr. Vaglienti wrote that Plaintiff had been under treatment at the Pain Center since December 2000, and had not responded to multiple interventional treatments or medications. He opined that Plaintiff was "suffering from a significant amount of pain, which [he] had unfortunately been unable to treat effectively," and opined that Plaintiff was disabled due to pain. The ALJ noted, however, there were only very limited treatment notes- an initial evaluation in December 2000 with a diagnosis of strain/sprain, a follow up in February 2001, again for cervical sprain-strain, a nerve block trigger point injection in October 2001, and a cervical epidural injection in November 2001.

Meanwhile, a consultative examination performed by Dr. Sabio in February 2001, showed Plaintiff had normal gait and stance. He could walk on his toes, heels, and was able to squat fully. Fine manipulation was well preserved. He had normal deep tendon reflexes and no muscle atrophy

or weakness. He was tender over the cervical, thoracic, and lumbar spine but had normal range of motion of the entire spine. Dr. Sabio diagnosed chronic back strain, history of multiple fractures, pain in the right thigh due to hardware fixation, and moderate obesity.

A 2003 physical examination performed by neurosurgeon Dr. Rosen again indicated Plaintiff had normal gait and station, muscle strength, and muscle tone. Sensation was normal. The doctor found only mild degenerative changes throughout the cervical spin on MRI, without any focal disc herniation, spondylosis or signs of nerve root or cord compression. Dr. Rosen recommended only conservative treatment including physical therapy, NSAIDS, and the avoidance of long-term narcotics.

The ALJ properly did not accord any significant weight to Dr. Vaglienti's opinion that Plaintiff was disabled, because that opinion was on an issue reserved to the Commissioner. Additionally, Dr. Vaglienti's opinion that Plaintiff suffered disabling pain was also unsupported by the record and was inconsistent with other persuasive evidence in the record, as found by the ALJ.

The ALJ therefore did not err by failing to grant any significant weight to the opinion of Dr. Vaglienti. Substantial evidence therefore supports the ALJ's determination regarding the credibility of Plaintiff's complaints of pain and limitation.

## F. Combined Effect of Impairments

Because, as already discussed, the ALJ did not properly address Plaintiff's medically determinable mental impairments, including possible depression, dysthymia, and adjustment disorder, the undersigned cannot determine that the ALJ properly considered the combined effects of all of Plaintiff's medically determinable impairments, including those alleged mental impairments,

36

in combination. The undersigned therefore finds substantial evidence does not support the ALJ's residual functional capacity or his ultimate determination that Plaintiff was not disabled.

### G. Appeals Council Remand

Plaintiff also argues that the Office of Hearings and Appeals failed to comply with the Appeals Council's directive to fully develop the record with respect to Plaintiff's mental impairment. The undersigned agrees with Plaintiff. The ALJ did retain a medical expert to review the psychological record, and did retain a vocational expert, as directed by the Appeals Council. As the undersigned has already found, however, the ALJ failed to:

> Evaluate the claimant's mental impairments in accordance with the special technique described in 20 CFR 416.920a and document application of the technique in the decision by providing specific findings and appropriate rationale for each of the functional areas described in 20 CFR 416.920a(c).

### V. RECOMMENDED DECISION

For the reasons above stated, the undersigned finds the Commissioner's decision denying Plaintiff's application for SSI is not supported by substantial evidence. I accordingly recommend Defendant's Motion for Summary Judgment be **DENIED**, and Plaintiff's Motion for Summary Judgment be **GRANTED IN PART** by reversing the Commissioner's decision under sentence four of 42 U.S.C. §§ 405(g) and 1383(c)(3), with a remand of the cause to the Commissioner for further proceedings consistent and in accord with this Recommendation.

Any party may, within ten (10) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the

basis for such objection. A copy of such objections should also be submitted to the Honorable Robert E. Maxwell, United States District Judge. Failure to timely file objections to the Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to mail an authenticated copy of this Report and Recommendation to counsel of record.

Respectfully submitted this /7 day of July, 2006.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE